1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUSAN KOSE, | No. CIV S-10-1371-CMK |
| Plaintiff, | |
| vs. | <u>MEMORANDUM OPINION AND ORDER</u> |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |
| _____/ | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending before the court are plaintiff's motion for summary judgment (Doc. 25) and defendant's cross-motion for summary judgment (Doc. 26).

/ / /

/ / /

/ / /

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on June 23, 2005.[1]  In the application, plaintiff claims that disability began on January 1, 2004.  Plaintiff claims that disability is caused by a combination of obesity, osteoarthritis, the need for daily naps, bilateral hand arthritis, and an inability to handle stress.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on May 21, 2007, before Administrative Law Judge ("ALJ") Stanley R. Hogg.   In a February 13, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairments: obesity, migraine headache syndrome, asthma, osteoarthritis of the right knee with chondromalacia, and degenerative disc disease;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in the regulations;

3. The claimant has the residual functional capacity to perform light work involving 4 hours of standing/walking per 8-hour day, lifting 20 pounds, sitting for 6 hours per 8-hour day, and no frequent concentrated exposure to dust, fumes, odors, and similar irritants; and

4. Considering the claimant's age, education, work experience, and residual functional capacity, and based on application of the Medical-Vocational Guidelines, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on April 6, 2010, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1]     Plaintiff previously filed for benefits in September 1996 which was denied based on the ALJ's conclusion that plaintiff could perform her past relevant work as a clerical worker.

1

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

December 4, 1987 – Plaintiff was admitted to the hospital with acute asthma exacerbation and streptococcal pneumonia.  Plaintiff was treated with "vigorous inhalation bronchodilator therapy" for the asthma and a seven-day course of penicillin for the pneumonia and released.

March 12, 1988 – Discharge notes reflect that plaintiff was admitted to the hospital due to acute shortness of breath.  Plaintiff was treated with intravenous medication and her condition cleared within two days.  She was then provided oral medication.

November 9, 1988 – Emergency room records from Mercy Medical Center indicate that plaintiff was admitted for an acute asthma attack.  She had run out of medication the previous morning and was experiencing increasing shortness of breath and wheezing.  Plaintiff was given medication and "she became relatively asymptomatic."  Chest x-rays were normal.

January 14, 1989 – Chest x-rays revealed minimal prominence of the interstitial markings consistent with a history of asthma.  There was, however, no focal consolidation, pleural effusion, or evidence of pulmonary edema.  The heart and bony structures were normal.

January 15, 1989 – Plaintiff was admitted to the University of California Medical Center in Sacramento for "asthma exacerbation."  On physical examination, plaintiff was noted to be "slightly obese."  Plaintiff was provided medication with follow-up scheduled for the next day.

May 12, 1995 – Agency examining psychiatrist Michael Joyce, M.D., performed a psychiatric evaluation incident to a prior application for social security benefits.  Plaintiff's chief complaint at the time was that she was "stressed out" and "can't get along with people."  Plaintiff reported that, as of that time, her only job had been answering phones for just over two weeks in January 1990, but she quit.  Based on an unremarkable mental status examination, Dr. Joyce was

unable to provide any Axis I psychiatric diagnosis.  The doctor assigned a global assessment of functioning ("GAF") score of 70 on a 100-point scale.  As to plaintiff's functional capabilities, Dr. Joyce stated:

> This claimant is able to manage funds, identify coins, and make exact change.  At this time, she is able to follow simple instructions.  She is able to maintain concentration and attention through the twenty-five minute interview.  She appears capable of maintaining attendance and performing within a schedule with punctuality and tolerance.  Today, she is able to work in coordination with this physician without distractibility.  Currently, she appears capable of completing a work day and work week without interruption from psychologically-based symptoms.
>
> At this time, the claimant is able to interact with others appropriately, ask simple questions, request assistance when needed, and adhere to socially appropriate behavior which does not distract others.  At this time, she is capable of identifying hazards and taking appropriate precautions.

May 13, 1995 – Agency examining physician Dale Ando, M.D., conducted an internal medicine examination incident to a prior application for benefits.  In addition to her asthma, plaintiff reported chronic low back pain as follows:

> . . . The patient has had chronic low back pain since 1987.  The pain is in the middle of her back with radiation down to the right leg.  Maneuvers that make the pain worse include prolonged sitting, standing, repetitive bending, or lifting.  Maneuvers that make the pain go away include Vicodin.  She does not use any assistive device in ambulation. . . .

On physical examination, the doctor expressed the following impressions relating to plaintiff's low back pain:

> . . . Physical exam shows a moderate decrease in range of motion of the lumbosacral spine, tenderness along the lower lumbosacral junction, increased pain with right straight-leg raising, and no evidence of focal neurologic deficits.  In addition, the patient's obesity with a height of 5 feet 3 inches and weight of 220 pounds is a significant etiologic and exacerbating symptomatic factor.

As to plaintiff's functional capabilities, Dr. Ando opined as follows:

> Limitations for lifting, carrying, pushing, and pulling: Total weight limitation up to 20 pounds on an occasional basis only.  There are no limitations for sitting, walking, or standing.  Physical activities that the patient should perform on an occasional basis only include crawling or stooping.  Physical findings to suggest these limitations include the

1   findings of: 1) reactive airway disease with mild chronic obstructive
2   pulmonary disease; 2) moderately severe chronic mechanical low back
    pain.

3   December 10, 1996 – Agency consultative physician Scott J. Rose, M.D.,

4   completed a psychiatric review technique form incident to a prior application for benefits.  Dr.

5   Rose stated that there was no evidence of any psychological history or treatment and concluded

6   that no diagnosis was possible.

7   February 6, 1997 – The record contains a report of a psychiatric evaluation

8   performed by agency examining psychiatrist Stephen M. Greenleaf, M.D.  Plaintiff's chief

9   complaint at the time was depression.  Plaintiff reported that her only job had been for a short

10  time in 1990 as a clerical worker and that she had not worked since then.  Following his

11  evaluation, the doctor diagnosed mood disorder secondary to plaintiff's physical problems and

12  assigned a GAF score of 65.  Dr. Greenleaf opined that plaintiff has affective and

13  neurovegetative signs of a mild, irritable depression.  He concluded that plaintiff could

14  understand, carry out, and remember complex instructions.  He concluded that plaintiff would be

15  able to function in situations with little peer or public contact and did not note any other

16  limitations.

17  February 20, 1997 – Dr. Rose submitted a mental residual functional capacity

18  assessment.  He concluded that plaintiff was moderately limited in her ability to understand and

19  remember detailed instructions, ability to carry out detailed instructions, ability to maintain

20  attention and concentration for extended periods, ability to complete a normal workweek without

21  interruptions from psychological symptoms, ability to interact appropriately with the public,

22  ability to get along with co-workers, and ability to set realistic goals.  In all other areas, Dr. Rose

23  opined that plaintiff's abilities were not significantly limited.

24  / / /

25  / / /

26  / / /

1          February 22, 1997 – Agency examining physician Michael Cohen, M.D., reported

2   on an orthopedic evaluation conducted incident to a prior application for benefits.  At the time,

3   plaintiff's chief complaint was low back pain.  Plaintiff reported that she can walk two to three

4   blocks, stand for 30 minutes, and sit for 30 minutes.  The stated that she must alternate positions

5   during the day for comfort.  On physical examination, the doctor noted that plaintiff's neck range

6   of motion was within normal limits.  Plaintiff's back range of motion was limited to 50% of

7   normal for flexion and extension.  Range of motion of the extremities was within normal limits.

8   Motor strength in all areas was normal.  Dr. Cohen opined that plaintiff could walk and stand for

9   four hours in an eight-hour day, and that she could sit for eight hours in an eight-hour day.  He

10  opined that plaintiff could frequently lift/carry up to 20 pounds, and occasionally lift/carry up to

11  40 pounds.  No limitations for bending, reaching, handling, fingering, feeling, kneeling, crawling,

12  crouching, balancing, or climbing were observed.

13         May 15, 1997 – Agency consultative physician David Mayman. M.D., reviewed a

14  prior residual functional capacity assessment form completed in December 1996.  The doctor

15  agreed  with the prior assessment that plaintiff should avoid even moderate exposure to fumes,

16  odors, etc., due to plaintiff's asthma.  Otherwise no communicative, postural, manipulative, or

17  visual limitations were noted.  Doctor Mayman appears to indicate that plaintiff could

18  occasionally lift/carry up to 40 pounds, and frequently lift/carry up to 20 pounds.  Plaintiff could

19  sit/stand/walk for up to six hours in an eight-hour day.  Plaintiff's ability to push/pull was

20  assessed as unlimited.

21         July 22, 2005 – The record contains a third-party function report submitted by

22  plaintiff's brother, Hikmet Kose.  Mr. Kose stated that plaintiff and her two sons live with him.

23  He stated that plaintiff cares for her sons and pet birds.  Mr. Kose stated that plaintiff has no

24  problems with personal care and prepares meals daily, though meal preparation "takes her longer

25  than it used to."  He also stated that plaintiff does the household chores, though other members of

26  the household "pitch in."  He stated that she does most such chores by herself once a week and

that it takes her two hours to finish.  Mr. Kose indicated that plaintiff shops once or twice a

month for clothing and groceries.  He stated that plaintiff has no problems handling financial

issues.  He added that plaintiff does not handle stress or change in routine.  As to getting along

with others, Mr. Kose stated: "She really doesn't.  It depends on the person or the day she has."

He stated that plaintiff wears a brace for her elbow, which was injured in an accident four years

earlier.

On this same date, plaintiff submitted a function report which is essentially the

same as Mr. Kose's report summarized above.  She also stated in this report that she has trouble

lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing,

remembering, completing tasks, understanding, using her hands, and getting along with others.

She stated that she could only walk for five minutes before having to rest.  She also stated that

she could only pay attention for five minutes at a time and that she cannot follow written

instructions.  As to spoken instructions, she stated: "You have to keep repeating over and over

again."  In concluding remarks, plaintiff stated that her problems are migraine headaches and

arthritis.  She did not mention asthma or low back pain, though she submitted answers to a

separate asthma questionnaire.

December 16, 2005 – Plaintiff submitted answers to a pain questionnaire.

According to plaintiff, her pain began in 1987 and is located in her mid to lower back, spreading

to her hips, shoulders, elbows, and knees.  She stated that the pain occurs all the time and is

constant.  Rest does not relieve the pain and she takes medication (Motrin) "all day long."

Plaintiff stated that medication sometimes relieves her pain, but "not much."  She also stated that

medication causes side effects such as nausea and occasional heartburn.  Plaintiff stated that she

does not use any devices to assist in relieving pain.  She stated that she is able to do errands, such

as grocery shopping, without any assistance, though she added that she has trouble lifting and

bending.  She stated that she can do housekeeping chores without assistance.  She also stated that

she is only able to walk for two to three blocks, stand for 15-20 minutes at a time, and sit for 10

minutes at a time.

September 16, 2005 – Agency examining physician Amit Rajguru, M.D., reported on a comprehensive physical examination.  Plaintiff's chief complaints at the time were arthritis, headaches, and back pain.  Plaintiff reported that she last worked in December 2004 as a mailroom clerk.  Based on his evaluation, the doctor concluded that plaintiff "has no limitations in her functional status."

September 22, 2005 – Agency consultative doctor David Pong, M.D., completed a physical residual functional capacity assessment.  He concluded that plaintiff would lift/carry 20 pounds occasionally and 10 pounds frequently, that plaintiff could sit/stand/walk for six hours in an eight-hour day, and that her ability to push/pull was unlimited.  As for postural limitations, Dr. Pong opined that plaintiff could only occasionally stoop or crouch, but that other postural activities could be done frequently.  No visual, manipulative, or communicative limitations were noted.  As for environmental limitations, the doctor stated that plaintiff had no limitations except to avoid even moderate exposure to odors, fumes, etc.  Dr. Pong specifically stated that, although there are new allegations, there are no new and material findings since her prior application was denied.

September 24, 2005 – Agency examining psychiatrist Richard Hicks, M.D., performed a comprehensive psychiatric evaluation.  Based upon testing results, Dr. Hicks diagnosed adjustment disorder secondary to her physical problems and assigned a GAF score of 65-70.  The doctor opined that plaintiff could do simple repetitive tasks, could take simple instructions, could be consistent and regular at work, could interact with co-workers and the public, and could manage her own funds.

September 26, 2006 – Treatment notes from plaintiff's treating Physician Octavio Camasura, M.D., reflect no objective findings on physical examination.

/ / /

/ / /

October 23, 2006 – Dr. Camasura prepared a "Certificate of Medical Necessity for a Motorized Wheelchair."  While no detailed description of plaintiff's functional capabilities was provided, Dr. Camasura indicated that the device was needed due to lower and upper extremity weakness.  Treatment notes from this same date reflect subjective complaints but no objective findings.

November 27, 2006 – Treatment notes from Dr. Camasura indicate that plaintiff was complaining of "bad pain" and that her medications were not working.  No specific objective findings are noted.

December 4, 2006 – The record contains reports of three x-rays taken on this date. Regarding an x-ray of plaintiff's right foot, no acute abnormality was noted, though there was mild spurring of the tarsal bones.  Regarding an x-ray of plaintiff's right shoulder, no acute abnormality was noted, though there were degenerative changes at the acromioclavicular joint. Finally, regarding an x-ray of plaintiff's cervical spine, mild multi-level degenerative changes and minimal foraminal narrowing bilaterally were noted.

December 28, 2006 – Treatment notes from Dr. Camasura indicate that, subjectively, plaintiff's cough was better.  No objective findings are noted.

July 30, 2007 – Agency examining physician Douglas Haselwood, M.D., who is a rheumatology specialist, performed a comprehensive medical evaluation.  Based on the objective examination results, Dr. Haselwood offered the following diagnoses:

1.   Chronic, somewhat poorly defined and widespread musculoskeletal pain and dysfunction syndrome.  Presumptively this represents degenerative and mechanical musculoskeletal phenomenon compounded by obesity and physical deconditioning and possible significant non-organic amplification.

2.   Co-morbidity to include obesity, migraine headache syndrome, and asthma.

/ / /

/ / /

9

The doctor opined as follows as to plaintiff's functional capabilities:

> Ms. Kose has some legitimate musculoskeletal problems but, unfortunately, the general nature and severity of her symptomatology and description of physical limitations is not supported by the more benign physical findings and limited supportive medical records. Based on her current physical presentation, and allowing for her obesity and physical deconditioning, Ms. Kose would seem realistically limited to a narrow range of light duty vocational functionality to the extent that standing/walking would be limited to four hours or less in an eight hour day with a two hour maximum and lifting/carrying would be limited to twenty pounds occasionally and ten pounds or less frequently. . . .

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

In her motion for summary judgment, plaintiff argues: (1) the ALJ improperly rejected the opinion of her treating physician, Dr. Camasura; (2) the ALJ improperly found plaintiff's testimony not credible; (3) the ALJ tacitly rejected lay witness evidence from plaintiff's brother without providing articulating reasons for doing so; and (4) the ALJ erred by relying on the Medical-Vocational Guidelines instead of obtaining testimony from a vocational expert.

### A.        Evaluation of Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

11

81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

without other evidence, is insufficient to reject the opinion of a treating or examining

professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

see also Magallanes, 881 F.2d at 751.

      As to plaintiff's treating physician, Dr. Camasura, the ALJ stated:

. . . Records from treating physician Octavio Camasura, M.D., indicate the
claimant was treated for sporadic episodes of upper respiratory symptoms,
rash, and an episode of back and shoulder pain (Ex. B-14F).  In November
2006 the claimant was treated in an emergency room for severe headache
and related symptoms (Ex. B-15F), and Dr. Camasura ordered x-rays in
December 2006, which revealed mild degenerative changes involving the
right ankle, shoulder, and cervical spine (Ex. B-13F).

          *  *  *

. . . [The claimant] began seeing Dr. Camasura in October 2006 and he
retired a month ago (i.e., in April 2007).

          *  *  *

. . . Although in reference to Dr. Camasura's unsigned report of March 14,
2007, indicating the claimant can stand/walk 0-2 hours, etc., [agency
examining physician] Dr. Haselwood deferred to Dr. Camasura, the
undersigned accords little weight to the prior treating source [Dr.
Camasura] – whose medical source statement is internally inconsistent and
outweighed by the balance of the record.  For example, Dr. Camasura
indicates that the claimant can sit for 2 to 4 hours at one time but only 0-2
hours for an entire 8-hour day.  Without explanation this conclusion is
patently absurd.  If a claimant can sit for 2 to 4 hours at one time, it would
be reasonable to expect that a claimant could sit for up to 6 hours over the
course of an 8-hour work day.  Further, the treating source's record[s]
contain only minimal findings for his examinations (See, Ex. B-14F).  In
any event, the persuasive medical report of a specialist in rheumatology
and internal medicine, Dr. Haselwood, supports the conclusion the

claimant has no real sitting limitations and only moderate limitations on standing and walking.

Plaintiff argues that the ALJ erred in rejecting Dr. Camasura's opinions because: (1) Dr. Haselwood, whose report the ALJ found persuasive, deferred to Dr. Camasura's opinions in reaching his own conclusions; (2) Dr. Camasura's opinion regarding sitting limitations was not, as the ALJ stated, internally inconsistent; and (3) contrary to the ALJ's characterization of the record, Dr. Camasura's treatment notes reflect "diagnoses and treatment for asthma, arthritis, degenerative disc disease, obesity, and migraine headaches, as well as clinical findings of muscle spasm, congestion, coughing, phlegm, and weights in the obese range."

As stated above, the ALJ need not give any weight to conclusory medical opinions which are supported by only minimal clinical findings. See id. Such is the case with Dr. Camasura's opinions. September 2006 treatment notes reflect no objective findings on physical examination. Similarly, treatment notes from November and December 2006 document plaintiff's subjective complaints (such as "bad pain"), but do not indicate any specific objective findings. In October 2006, Dr. Camasura prepared a "Certificate of Medical Necessity for a Motorized Wheelchair," stating that the device was necessary for lower and upper extremity weakness, but no objective findings are noted. The ALJ did not err in rejecting Dr. Camasura's minimally (if at all) supported opinions.

**B.      Plaintiff's Credibility**

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative

evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

1   Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

2          Regarding reliance on a claimant's daily activities to find testimony of disabling

3   pain not credible, the Social Security Act does not require that disability claimants be utterly

4   incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

5   repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . .

6   does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

7   Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

8   Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

9   claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

10  restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

11  claimant was entitled to benefits based on constant leg and back pain despite the claimant's

12  ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

13  activities are not easily transferable to what may be the more grueling environment of the

14  workplace, where it might be impossible to periodically rest or take medication").   Daily

15  activities must be such that they show that the claimant is ". . .able to spend a substantial part of

16  his day engaged in pursuits involving the performance of physical functions that are transferable

17  to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard

18  before relying on daily activities to find a claimant's pain testimony not credible.  See Burch v.

19  Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

20          As to plaintiff's credibility, the ALJ summarized her testimony as follows:

21          At the hearing, the claimant testified that she last worked as an office
            assistant, but could not stand the whole 8 hours and worked only 3 weeks.
22          She experiences migraines three or four times a week, which will last from
            1/2 hour up to a whole day.  Four or five times a month she also
23          experiences breathing problems, which depends on pollens, perfumes,
            detergents, etc.  She uses an inhaler which will sometimes resolve it and
24          occasionally she has gone to an emergency room.  She also has problems
            with arthritis from her shoulders to her back and feet and also her hands
25          get numb and tingly and ache and make it hard to hold thing[s] or even
            walk and which lasts for an hour and 2 or 3 times a day.  Sometimes
26          medicine takes it away but it comes back.  Pain wakes her up.  Twice a day

she takes naps for half an hour.  Her back pain is there all the time and about twice a week she gets knee pain lasting for an hour or two.  Her chest also feels heavy and sometimes she's tired; by 3:00 o'clock her energy is low and she's tired and aches and takes a nap.  She has occasional side effects from medication including nausea, some light headedness which occurs one or two times a week.  Sometimes she's depressed due to aches and pains and she feels alone in the world, which occurs a couple of times a month.  She described her daily activities as arising at 6:00 o'clock, getting the children up for school, bathing, meal planning, grocery shopping with the neighbor lifting the bags, preparing one meal a day, watching television, visiting with her neighbor, and receiving help from her children doing the housework.  It's a strain to stand for 30 minutes and she can walk about 2 blocks and sit for 30 minutes.  She sometimes drops things and she's limited to lifting 5 pounds. . . .

The ALJ then offered the following analysis of plaintiff's credibility:

After considering the evidence of record, the undersigned finds that . . . the claimant's statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible.

* * *

Clearly, the claimant's osteoarthritis, obesity, and asthma reasonably restrict her to a level of exertional activity falling between the demands of a full range of light work.  However, the claimant's testimony that it's a strain to stand for 30 minutes at a time is not credited, and her testimony that she can only lift 5 pounds; again, such limitations are clearly excessive in view of the minimal objective findings, her wide-ranging daily activities, and observations and assessments by examining medical sources. . . . Further, the claimant's prehearing statements indicate that she prepares daily meals, gets help from others but also spends 2 hours by herself doing housework, shops for 3 1/2 hours, and can lift up to 10 pounds (Ex. B-6E).  A subsequent statement indicates she spends an hour or two a day with meal preparation, four to five hours house cleaning, goes outside every day, shops for about 2 1/2 hours, and otherwise engages in a wide range of daily activities that would be compatible with full-time work within the residual functional capacity found here (See, Ex. B-14E).  In view of the claimant's inconsistent testimony to the contrary, I am unable to credit the claimant's testimony given at the hearing.  Her testimony that she can only sit for 30 minutes is also not consistent with her wide-ranging activities or the record otherwise and cannot be credited. . . . .

///

///

///

16

1    Plaintiff argues that the ALJ erred in rejecting her testimony because he

2    improperly considered whether there was an impairment that could produce the degree of

3    symptoms to which plaintiff testified.  Plaintiff also claims that, ". . . given her obesity, asthma,

4    and degenerative joint disease there was no doubt that it would be a strain to stand for 30 minutes

5    at a time."  Finally, plaintiff argues that the ALJ put too much emphasis on her daily activities.

6    While plaintiff is correct that the ALJ may not reject subjective testimony merely

7    because the degree of pain to which the plaintiff testifies is not supported by the objective

8    evidence, the ALJ may disbelieve testimony as to symptoms greater than would normally be

9    produced by a given impairment.  In other words, the ALJ may not discredit testimony as to the

10   degree of pain which could reasonably be caused by an impairment, but the ALJ may discredit

11   testimony as to symptoms which the objective evidence does not indicate are caused by any

12   particular impairment.  In this case, the ALJ made the latter finding.  Specifically, while the ALJ

13   conceded that plaintiff's impairments could cause some limitations, the ALJ concluded that

14   plaintiff's testimony of totally debilitating symptoms are not reasonably related to any

15   impairment established by objective evidence.  The ALJ was not looking to the degree of pain to

16   which plaintiff testified, but was looking to the effect of such pain and whether those effects are

17   supported by the record.  The ALJ correctly concluded they are not.

18   **C.    Lay Witness Testimony**

19   In determining whether a claimant is disabled, an ALJ generally must consider lay

20   witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

21   919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

22   testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

23   evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

24   F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

25   of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

26   919.

1    The ALJ, however, need not discuss all evidence presented.  See Vincent on

2  Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

3  why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,

4  706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored evidence

5  which was neither significant nor probative.  See id. at 1395.  As to a letter from a treating

6  psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

7  uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

8  controverted by other medical evidence considered in the decision.  See id.  As to lay witness

9  testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

10  concluded that the evidence was properly ignored because it "conflicted with the available

11  medical evidence" assessing the plaintiff's mental capacity.  Id.

12    In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

13  disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay witness

14  had testified about the plaintiff's "inability to deal with the demands of work" due to alleged

15  back pain and mental impairments.  Id.  The witnesses, who were former co-workers testified

16  about the plaintiff's frustration with simple tasks and uncommon need for supervision.  See id.

17  Noting that the lay witness testimony in question was "consistent with medical evidence," the

18  court in Stout concluded that the "ALJ was required to consider and comment upon the

19  uncontradicted lay testimony, as it concerned how Stout's impairments impact his ability to

20  work." Id. at 1053.   The Commissioner conceded that the ALJ's silent disregard of the lay

21  testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

22  Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

23  1054-55.  The court concluded:

24    Because the ALJ failed to provide any reasons for rejecting competent lay
      testimony, and because we conclude that error was not harmless,
25    substantial evidence does not support the Commissioner's decision . . .

26    Id. at 1056-67.

1    From this case law, the court concludes that the rule for lay witness testimony

2  depends on whether the testimony in question is controverted or consistent with the medical

3  evidence.  If it is controverted, then the ALJ does not err by ignoring it.  <u>See</u> <u>Vincent</u>, 739 F.2d at

4  1395.  If lay witness testimony is consistent with the medical evidence, then the ALJ must

5  consider and comment upon it.  <u>See</u> <u>Stout</u>, 454 F.3d at 1053.  However, the Commissioner's

6  regulations <u>require</u> the ALJ consider lay witness testimony in certain types of cases.  <u>See</u> <u>Smolen</u>

7  <u>v. Chater</u>, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling <u>requires</u> the ALJ to

8  consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that

9  are not shown by the medical evidence.  <u>See</u> <u>id.</u>  Thus, in cases where the plaintiff alleges

10  impairments, such as chronic fatigue or pain (which by their very nature do not always produce

11  clinical medical evidence), it is impossible for the court to conclude that lay witness evidence

12  concerning the plaintiff's abilities is necessarily controverted such that it may be properly

13  ignored.  Therefore, in these types of cases, the ALJ is required by the regulations and case law to

14  consider lay witness evidence.

15    As to statements offered by plaintiff's brother, Hikmet Kose, the ALJ stated:

16    . . . The claimant's brother's third-party statement also demonstrates the
      claimant's additional functional capacity beyond the limitations in her
17    testimony, i.e., her brother indicated that she spends about 2 hours doing
      household chores by herself (Ex. B-5E). . . .
18

19  Plaintiff claims that, with this discussion, the ALJ "tacitly rejected Hikmet Kose's third party

20  statements without articulating any reasons for doing so."  The court disagrees.  While the ALJ's

21  discussion of Mr. Kose's testimony was brief, it nonetheless offered reasons germane to Mr.

22  Kose.  Specifically, as with plaintiff's testimony, the ALJ found Mr. Kose's statements to be

23  inconsistent with his other statements of plaintiff's daily activities.

24  / / /

25  / / /

26  / / /

1        **D.    Application of the Medical-Vocational Guidelines**

2            The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

3    disability for various combinations of age, education, previous work experience, and residual

4    functional capacity.  The Grids allow the Commissioner to streamline the administrative process

5    and encourage uniform treatment of claims based on the number of jobs in the national economy

6    for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

7    460-62 (1983) (discussing creation and purpose of the Grids).

8            The Commissioner may apply the Grids in lieu of taking the testimony of a

9    vocational expert only when the Grids accurately and completely describe the claimant's abilities

10   and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

11   Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

12   Grids if a claimant suffers from non-exertional limitations because the Grids are based on

13   exertional strength factors only.[2]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

14   "If a claimant has an impairment that limits his or her ability to work without directly affecting

15   his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

16   by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

17

18          [2]     Exertional capabilities are the primary strength activities of sitting, standing,
     walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
19   perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
     P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
20   and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20
     C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at
21   a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§
     404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
22   with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§
     404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
23   with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§
     404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
24   100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
     See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
25          Non-exertional activities include mental, sensory, postural, manipulative, and
     environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R.,
26   Part 404, Subpart P, Appendix 2, § 200.00(e).

1  Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

2  even when a claimant has combined exertional and non-exertional limitations, if non-exertional

3  limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

4  1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

5           In cases where the Grids are not fully applicable, the ALJ may meet his burden

6  under step five of the sequential analysis by propounding to a vocational expert hypothetical

7  questions based on medical assumptions, supported by substantial evidence, that reflect all the

8  plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

9  where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

10 ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

11 1341 (9th Cir. 1988).

12          Regarding the Grids, the ALJ stated:

13          If the claimant had the residual functional capacity to perform the full
            range of sedentary or light work, considering the claimant's age,
14          education, and work experience, a finding of "not disabled" would be
            directed by Medical-Vocational Rules 201.24 and 202.17.  However, the
15          additional limitations have little or no effect on the occupational base of
            unskilled light work.  A finding of "not disabled" is therefore appropriate
16          under the framework of these rules.  Her physical limitations allow her to
            perform a full range of at least sedentary exertion and a narrow range of
17          light work with standing/walking limited to 4 hours in an 8 hour workday;
            her environmental restrictions would not significantly erode the remaining
18          occupational bases because most jobs do not involve working around
            concentrated exposure to dust, fumes, odors, etc.  See, Social Security
19          Ruling 85-15.

20 Plaintiff argues that, because her limitations are "nonexertional in the main . . . including chronic

21 pain, lack of energy/fatigue, sit/stand/walk limitations, lift/carry limitations, environmental

22 limitations, pain, the need to frequently shift positions, the need for daily naps, and inability to

23 handle stress," vocational expert testimony was required.  The court rejects this argument

24 because, as discussed above, there is insufficient objective evidence supporting the non-

25 exertional limitations listed by plaintiff."  Any non-exertional limitations did not significantly

26 impact the plaintiff's ability to perform the exertional demands of work.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

> 1.    Plaintiff's motion for summary judgment (Doc. 25) is denied;
>
> 2.    Defendant's cross-motion for summary judgment (Doc. 26) is granted; and
>
> 3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED:  October 5, 2011

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE